

FILED
2017 Jun-19  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PHILLIP McGEE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No.:  2:16-cv-02082-KOB |
| | ) | |
| BOEHRINGER INGELHEIM | ) | |
| PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT BOEHRINGER INGELHEIM PHARMACEUTICALS,
INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT AND MEMORANDUM IN SUPPORT</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

STATEMENT OF FACTS ......................................................................2

REGULATORY BACKGROUND ...........................................................4

LEGAL STANDARD..............................................................................8

I.     Plaintiff's New Allegations, Solely Based on Data Submitted to the FDA before the FDA Approved Jardiance, Cannot Save HIS Failure-to-Warn Claims. ....................................................................................................9

        a.    State Laws That Conflict With Federal Laws Are Preempted............10

        b.    According To Plaintiff's Own Allegations, BIPI Could Not Have Changed The Jardiance Label Prior To Or After FDA Approval.......13

            i.    Upon FDA Approval To Market Jardiance, Federal Law Required BIPI To Provide The FDA-Approved Jardiance Label, Which Did Not Include A DKA Warning. ....................14

            ii.    Plaintiff's FAC Does Not Include Any Allegations To Support A Claim That BIPI Should Have Changed The Jardiance Label After FDA Approval. ..................................................18

II.    Plaintiff's FAC Remains Insufficiently Pled..................................21

        a.    Plaintiff Has Not Stated A Claim Under The AEMLD (Count I). .....22

        b.    Plaintiff Does Not State Plausible Claims For Negligence Or Gross Negligence (Counts II-III)..................................................26

            i.    Plaintiff's Negligence Count Is Factually Deficient And Must Be Dismissed (Count II). .........................................................26

            ii.    Plaintiff Does Not State A Claim For Willful And Wanton Conduct Or Gross Negligence (Count III)................................30

CONCLUSION .....................................................................................30

Pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") submits this Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") for failure to state a claim upon which relief can be granted.

## INTRODUCTION

This case arises out of Plaintiff Phillip McGee Sr.'s alleged development of diabetic ketoacidosis ("DKA"), which he attributes to his use of Jardiance. Jardiance is a prescription drug that belongs to the class of drugs known as sodium-glucose cotransporter-2 ("SGLT-2") inhibitors. Jardiance was approved by the U.S. Food and Drug Administration ("FDA") as safe and effective for the treatment of type 2 diabetes on August 1, 2014.

On his second attempt, Plaintiff comes no closer to pleading a cognizable claim against BIPI, and thus the FAC [D.E. 19] should be dismissed.[1] Plaintiff's new failure-to-warn allegations are premised on a theory that the initial FDA-approved warnings in Jardiance's labeling should have contained different information. Specifically, the FAC cites information collected from March 2013 to June 6, 2014 that served as the basis for a May 15, 2015 FDA safety alert ("FDA

---

[1] BIPI previously moved to dismiss Plaintiff's original Complaint [D.E. 1] for failure to allege sufficient facts in support of his claims for (1) products liability – failure to warn (strict liability); (2) violations of the Alabama Extended Manufacturers' Liability Doctrine ("AEMLD"); (3) negligence; and (4) willful and wanton conduct or gross negligence. Rather than respond to the Motion [D.E. 12], Plaintiff filed the FAC.

Alert") regarding the SGLT-2 inhibitor class and DKA. Importantly, the information collected from March 2013 to June 6, 2014 did not concern Jardiance at all, but concerned two other medications in the SGLT-2 inhibitor class. Moreover, pursuant to existing federal regulations and Supreme Court precedent, the FDA assessed Jardiance's warning at the time of approval in August 2014, deemed Jardiance to be safe and effective when accompanied by that warning, and required Jardiance to be accompanied by the *precise warning* approved by the FDA at the commencement of marketing Jardiance. Thus, any state law duty to provide a different warning at the time of Jardiance's FDA approval is preempted. Additionally, Plaintiff's FAC does not plausibly allege that BIPI became aware of any "newly acquired information" that was unknown to the FDA and thus would have allowed BIPI to voluntarily change Jardiance's label *after* the FDA approved Jardiance. Accordingly, all of Plaintiff's claims, predicated on a failure-to-warn theory, are preempted by federal law.

Without his new failure-to-warn theory, which is preempted, Plaintiff is back where he started, with an FAC that is devoid of facts sufficient to state a claim under federal pleading requirements. Except for adding the theory predicated on the FDA Alert and the data on which it rested, Plaintiff's allegations have remained substantively unchanged from those in his original Complaint. Even if Plaintiff's new failure-to-warn theory is not preempted (which it is), Plaintiff's FAC still does

not plausibly allege how the warnings contained in Jardiance's label were defective or unreasonably dangerous or how the alleged defect in those warnings caused Plaintiff's injuries. Because Plaintiff has now had two opportunities to allege facts sufficient to withstand a motion to dismiss and has failed to do so each time, his FAC should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

Diabetes is a serious healthcare epidemic in the United States and worldwide, characterized by uncontrolled blood glucose (sugar) levels. Jardiance (*empagliflozin*) was approved by the FDA on August 1, 2014, for the treatment of type 2 diabetes. FAC ¶ 15. It is a member of the newest class of medications used to treat type 2 diabetes known as SGLT-2 inhibitors. *Id.* SGLT-2 inhibitors provide a novel mechanism for lowering glucose levels. *Id.* ¶ 17.

Plaintiff alleges he began taking Jardiance to treat diabetes "in or about JanuaryMarch [sic] 2015," *id.* ¶ 26, and experienced DKA "on or about January 17, 2015," *id.* ¶ 31.[3] "[O]n May 15, 2015, the FDA issued a safety announcement covering the SGLT-2 inhibitor class, warning about the risk of DKA and advising that the FDA would continue to evaluate the safety issue." *Id.* ¶ 35. "The data used

---

[2] The Statement of Facts is only based on the factual allegations in the FAC and the materials incorporated by reference therein, but BIPI does not concede the truth of the FAC's allegations.

[3] If Plaintiff is alleging that he experienced DKA *before* he was first prescribed Jardiance, Plaintiff's FAC should be dismissed for failure to plead that Jardiance caused his alleged injuries, a central element of each of his claims. *See infra* at 22-23, 26.

in FDA's May 15, 2015 safety alert was collected from March 2013 to June 6, 2014, nearly two months prior to Jardiance's approval," *id.* ¶ 36, from "the FDA Adverse Event Reporting System ("FAERS"), a publicly available database," *id.* ¶ 38.  Based on the "same information FDA relied on to issue its May 15, 2015" alert, Plaintiff contends that BIPI violated state law because BIPI "did not warn about the risks of DKA" at the time "JARDIANCE was approved," *id.* ¶ 55, and did not "amend the label or utilize the [FDA's Changes Being Effected ("CBE")] process" to warn about the risk of DKA before Plaintiff used Jardiance, *id.* ¶ 71(c).

Plaintiff's FAC still does not provide any factual statements about Plaintiff's diabetes, other (non-SGLT-2 inhibitor) diabetes medication use, or his development of DKA.  Plaintiff also alleges that he experienced "other related health complications," *id.* ¶¶ 94, 118, but nowhere does Plaintiff identify them, much less allege a failure to warn about alleged "other" complications.

## REGULATORY BACKGROUND

Congress has entrusted to the FDA sole authority to approve prescription drugs for sale in the United States.  *See, e.g.*, 21 U.S.C. § 393(b).  The Federal Food, Drug, and Cosmetic Act ("FDCA") requires drug manufacturers to gain FDA approval before marketing or selling a new drug in interstate commerce.  21 U.S.C. § 355(a).  To receive approval, the drug must "meet[] the statutory standards for

safety and effectiveness, manufacturing and controls, and labeling," as determined by the FDA.  21 C.F.R. § 314.105(c).

To seek FDA approval of a drug, a drug manufacturer must submit either a new drug application ("NDA") for a new drug or a supplemental NDA ("sNDA") for a new drug treatment, which are subject to the same approval requirements.[4]  *See* 21 C.F.R. § 314.1, *et seq.*  The FDA approval process is "onerous and lengthy," *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2471 (2013), and the FDA will refuse to approve a drug if it lacks either "adequate tests . . . to show whether or not [the] drug is safe for use" or "substantial evidence that the drug will have the effect it purports or is represented to have . . . ." 21 U.S.C. § 355(d)(1), (5).[5]

"The FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label."  *Wyeth v. Levine*, 555 U.S. 555, 568 (2009).  The NDA or sNDA must include "the labeling proposed to be used" for

---

[4] An NDA or sNDA consists of a compilation of materials that includes "full reports of [all clinical] investigations," 21 U.S.C. § 355(b)(1)(A); 21 C.F.R. § 314.50(d)(5), relevant nonclinical studies, and "any other data or information relevant to an evaluation of the safety and effectiveness of the drug product . . . ." 21 C.F.R. § 314.50(d)(2), (d)(5)(iv).

[5] Substantial evidence that a drug will have the effect it purports or is represented to have generally consists of "adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved . . . ." *Id*. § 355(d); *see also* 21 C.F.R. § 314.126 (defining adequate and well-controlled studies).  "[D]ata from one adequate and well-controlled clinical investigation and [other] confirmatory evidence" may constitute "substantial evidence" if the FDA "determines, based on relevant science, that [such] data . . . are sufficient to establish effectiveness."  21 U.S.C. § 355(d).

the drug, 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50(c)(2)(i), and "a discussion of why the [drug's] benefits exceed the risks under the conditions stated in the labeling." 21 C.F.R. § 314.50(d)(5)(viii). In making a detailed review of proposed labeling, the FDA seeks to allow "only information for which there is a scientific basis to be included." Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49603-01, 49604 (Aug. 22, 2008) (hereinafter Labeling Changes). To approve an NDA or sNDA, the FDA must determine, "based on a fair evaluation of all material facts," that the proposed label is not "false or misleading in any particular," 21 U.S.C. § 355(d)(7), or otherwise "does not comply with the requirements for labels and labeling." 21 C.F.R. § 314.125(b)(6), (8). Once the FDA approves an NDA or sNDA, a manufacturer may distribute the drug so long as it uses the FDA-approved label; if it does not do so, it violates federal law. *See* 21 U.S.C. §§ 331(c), 333(a), 352(a), (c).

After the FDA approves a drug, there are two ways a manufacturer can change the drug's label. "First, the default rule is that a manufacturer must secure FDA approval for a proposed change prior to distributing the product with the changed label." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 37 (1st Cir. 2015) (citing 21 C.F.R. § 314.70(b)(2)(v)(A)). Second, under the CBE regulation, a drug manufacturer can, without prior FDA approval, make certain types

of changes to the drug's label by sending a "supplement submission" to the FDA.
*See* 21 C.F.R. § 314.70(c)(6)(iii).

To change the drug's label pursuant to the CBE process, the drug manufacturer must satisfy two requirements.  First, the label change must reflect "newly acquired information," *id.*, defined by regulation as

> data, analyses, or other information *not previously submitted to the Agency*, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) *if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.*

*Id.* § 314.3(b) (emphasis added).  Second, the label change must accomplish at least one of five objectives, including, *inter alia*, "[t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling."  *Id.* § 314.70(c)(6)(iii)(A).[6]  By expressly requiring that a CBE change only reflect newly acquired information "based on sufficient evidence of a causal association," the FDA ensures "that scientifically accurate information appears in the approved labeling." Labeling Changes, 73 Fed. Reg. 49603-01, 49604 (Aug. 22, 2008).

---

[6] The FDA has recognized that "[e]xaggeration of risk, or inclusion of speculative or hypothetical risks, could discourage appropriate use of a beneficial drug . . . or decrease the usefulness and accessibility of important information by diluting or obscuring it."  Labeling Changes, 73 Fed. Reg. 2848-01, 2851 (Jan. 16, 2008).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, the FAC must contain enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Allain v. Wyeth Pharm., Inc.*, No. 2:14-CV-00280-KOB, 2015 WL 178038, at *1 (N.D. Ala. Jan. 14, 2015) (Bowdre, C.J.) (alterations in original). Plausibility requires more than a "sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, and "necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 (11th Cir. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, and unadorned, the-defendant-unlawfully-harmed-me accusation[s], cannot withstand a motion to dismiss." *Odion v. Google Inc.*, 628 F. App'x 635, 637 (11th Cir. 2015) (*per curiam*) (quotation marks omitted).

In ruling upon a Rule 12(b)(6) motion to dismiss, the court may consider the complaint as well as documents that are "(1) central to the plaintiff's claim and (2) undisputed," meaning "the authenticity of the document is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  Additionally, "[a] district court

may take judicial notice of matters of public record." *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (*per curiam*). FDA documents may properly be considered on a motion to dismiss. *See, e.g.*, *Miller v. Pfizer Inc.*, No. 4:13-CV-01687-KOB, 2014 WL 2155020, at *2 (N.D. Ala. May 22, 2014) (Bowdre, C.J.) (considering FDA-approved labels).

## I.   PLAINTIFF'S NEW ALLEGATIONS, SOLELY BASED ON DATA SUBMITTED TO THE FDA BEFORE THE FDA APPROVED JARDIANCE, CANNOT SAVE HIS FAILURE-TO-WARN CLAIMS.

To support his claim that "Defendant knew or should have known the risks associated with using JARDIANCE, including the risk of developing [DKA]," FAC ¶ 34, Plaintiff solely relies on allegations regarding "at least 20 cases of DKA" contained in the FAERS database that occurred with other SGLT-2 inhibitors *before* Jardiance received FDA approval. *Id.* ¶ 71(b). Plaintiff alleges that BIPI, "armed with this data," should have changed Jardiance's label to include a DKA warning; in other words, Plaintiff alleges that BIPI should have sought FDA approval of a different initial label or used the CBE process to change the label after FDA approval. *Id.* ¶ 71(c). However, because Plaintiff bases his failure-to-warn claims on data related to other SGLT-2 inhibitors that was available and submitted to the FDA through FAERS *before* the FDA approved Jardiance, Plaintiff's claims are preempted by federal law, a purely legal issue that the Court may decide at the pleading stage. *See, e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 611-12, 626 (2011);

*see also In re Celexa*, 779 F.3d at 43 (affirming dismissal of complaint on preemption grounds, because defendants could not have independently changed drug label at time of FDA approval or after FDA approval pursuant to CBE process); *Utts v. Bristol-Myers Squibb Co.*, -- F. Supp. 3d --, 2016 WL 7429449, at *10 (S.D.N.Y. Dec. 23, 2016) (hereinafter *Utts I*) (holding on motion to dismiss that failure-to-warn claims were preempted, where claims were premised on adequacy of FDA-approved label when drug was first marketed and where plaintiffs did not plead any "newly acquired information" that would have allowed manufacturer to independently change warnings in label pursuant to CBE process); *Utts v. Bristol-Myers Squibb Co.*, -- F. Supp. 3d --, 2017 WL 1906875, at *1 (S.D.N.Y. May 8, 2017) (hereinafter *Utts II*) (after plaintiffs amended complaint dismissed in *Utts I*, dismissing preempted failure-to-warn claims with prejudice, because plaintiffs did not plausibly plead any "newly acquired information" that would have allowed manufacturer to use CBE process to add or improve warnings). And because no amount of re-pleading can save Plaintiff's failure-to-warn claims, the Court should dismiss these claims with prejudice.

### a.  State Laws That Conflict With Federal Laws Are Preempted.

The doctrine of preemption arises from the Supremacy Clause of the United States Constitution, which provides that the Constitution, federal law, and all treaties are "the supreme Law of the Land; and the Judges in every State shall be bound

thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Thus, since the Supreme Court's decision in *McCulloch v. Maryland*, it has been settled that state law that conflicts with federal law is "without effect." *Bartlett*, 133 S. Ct. at 2470. Conflict preemption precludes the application of state law when it is "impossible for a private party to comply with both state and federal requirements." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 899 (2000).

Three recent Supreme Court decisions have outlined the test for conflict preemption in pharmaceutical drug cases. In *Wyeth*, the Court explained that the impossibility variety of conflict preemption does *not* exist where a federal regulatory provision expressly allows a manufacturer to unilaterally do what state law allegedly would require. *See* 555 U.S. at 572-73. There, a jury found a brand name drug manufacturer liable for inadequately warning of the dangers of administering a drug through a certain method. *Id.* at 558. The Supreme Court rejected the manufacturer's preemption defense, reasoning that, *after* receiving FDA approval for the drug, the manufacturer could have used the CBE process to update the drug's label when the alleged risks became apparent. *Id.* at 571-73. "By hinging preemption on the availability [to use the CBE process] in a particular case, *Wyeth* effectively reserves the launch of new drugs to the expertise of the FDA, but then

11

preserves a wide scope for the states in requiring manufacturers to respond to information not considered by the FDA." *In re Celexa*, 779 F.3d at 41.

Two years later, in *Mensing*, the Court clarified that "[t]he question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it," defining independently to mean unilaterally, "without the Federal Government's special permission and assistance." 564 U.S. at 620-24. "The Court thus limited *Levine* to situations in which the drug manufacturer can, 'of its own volition, . . . strengthen its label in compliance with its state tort duty.'" *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 295 (6th Cir. 2015); *see also In re Celexa*, 779 F.3d at 41 (same).

Finally, in *Bartlett*, the Court held that the *Mensing* impossibility preemption test applies beyond *Mensing*'s facts—*i.e.*, a failure-to-warn claim against a generic drug manufacturer—by holding that it would be impossible for a drug manufacturer to make major changes to the design of any drug, "whether generic or brand-name," without the FDA's special assistance or permission. 133 S. Ct. at 2471. Any such change, the Court held, would render the drug a "new drug" that must receive FDA approval, therefore confirming the core holding of *Mensing* that, when a party cannot satisfy its alleged duties underlying a plaintiff's state law claim *before* obtaining the FDA's approval, those state law claims are preempted by federal law. "Read holistically," *Wyeth*, *Mensing*, and *Bartlett*, "indicate that federal law preempts all

pre-FDA approval failure to warn and design defect claims for branded prescription medication." *Utts II*, 2017 WL 1906875, at *9.

The *Wyeth, Mensing*, and *Bartlett* decisions leave lower courts with an easily applied framework for determining when impossibility preemption applies to a state law claim.  First, courts should determine what duties the state law underlying the plaintiff's claims places on the defendant related to the product in question.  Then, courts must determine whether a federal law or regulation exists that would prevent the defendant from taking that action independently, *i.e.* without a federal agency's "special permission and assistance." *Mensing*, 564 U.S. at 623-24.  Where the federal law or regulation prohibits the defendant from independently taking the action required by the state law claim, the claim is preempted.  *Id.*

### b. According To Plaintiff's Own Allegations, BIPI Could Not Have Changed The Jardiance Label Prior To Or After FDA Approval.

Plaintiff attempts to plead warnings-based claims under Alabama state law. The Alabama Supreme Court has stated that a duty to warn arises when a manufacturer has knowledge or could have developed knowledge "by the application of reasonable, developed human skill and foresight that the product presented a danger of injury of the kind suffered by [plaintiff]." *Griggs v. Combe, Inc.*, 456 So. 2d 790, 792 (Ala. 1984) (internal quotation marks omitted).

Specifically, Plaintiff claims that the initial Jardiance label was inadequate as a matter of state law, despite being approved by the FDA, because BIPI did not warn

of the alleged risk of DKA even though the FAERS database "established a signal between SGLT-2 inhibitors and DKA," FAC ¶ 71(a), based on 20 DKA-related "reports available to Defendant *before* JARDIANCE entered the market." *Id.* ¶ 53. Plaintiff's failure-to-warn claims, solely premised on data publicly available and indeed submitted to the FDA *before* the FDA approved Jardiance, fail because BIPI was compelled by federal law to use the FDA-approved Jardiance label when it first marketed Jardiance and could not have changed the Jardiance label after FDA approval based on alleged pre-launch data related to other SGLT-2 inhibitors that was already known to the FDA.

### i. Upon FDA Approval To Market Jardiance, Federal Law Required BIPI To Provide The FDA-Approved Jardiance Label, Which Did Not Include A DKA Warning.

Plaintiff's claim that BIPI knew or should have known of the risk of DKA based on the 20 DKA cases involving other SGLT-2 inhibitor drugs, which were known to the FDA and published in the FDA's own database, and that therefore BIPI should have provided a DKA warning upon first marketing Jardiance, are preempted. Such failure-to-warn claims, predicated on the notion that a different warning should have been provided at the time of FDA approval, directly challenge aspects of the drug that the FDA expressly approved, and from which BIPI could not deviate. As other courts have recognized, permitting such a claim to proceed would render FDA approval all but meaningless, and therefore the state law claim is

preempted. *See, e.g.*, *In re Celexa*, 779 F.3d at 41 (explaining that the FDA is the "exclusive judge" of "how a drug can be marketed" on approval); *Utts I*, 2016 WL 7429449, at *10 (finding failure-to-warn claims premised on adequacy of FDA-approved label when drug was first marketed preempted, because labeling is "centerpiece of risk management for prescription drugs" and "reflects thorough FDA review of the pertinent scientific evidence").

The FDA approves a drug *only* if it determines that the drug in question is safe for use under its proposed labeling and that its probable therapeutic benefits outweigh its risks of harm.  21 U.S.C. § 355(d).  In *Wyeth*, the Supreme Court made clear that "[t]he FDA's premarket approval of a new drug application includes the approval of the exact text in the proposed label."  555 U.S. at 568.  Here, in approving Jardiance, the FDA commanded BIPI that "[c]ontent of labeling must be identical to the enclosed labeling (text for the package insert and text for the patient package insert)."  Jardiance NDA Approval Letter (Aug. 1, 2014) at 1, http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/204629Orig1s000lt r.pdf (last visited June 17, 2017) and attached hereto as **Exhibit 1**.  BIPI would have violated federal law (*i.e.*, Jardiance would have been misbranded) if, upon approval, BIPI instead had marketed Jardiance with labeling and warnings other than what the FDA approved.  *See* 21 U.S.C. §§ 331(c), 333(a), 352(a), (c).  Thus, *Wyeth* and *Mensing* drew a line that "lets the FDA be the exclusive judge of safety and efficacy

based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops." *In re Celexa*, 779 F.3d at 41.

Plaintiff's state law claim that different warnings should have been provided when BIPI commenced marketing Jardiance is therefore preempted.  Allowing state law to find that a drug from its first marketing was "unreasonably dangerous" on account of its label would invariably conflict with the FDA's considered judgment.  "To the extent that the failure to warn claims are premised on the adequacy of the label as approved by the FDA when the drug was first marketed in the United States, they are preempted." *Utts I*, 2016 WL 7429449, at *10.  The *Utts I* court, for example, explained that brand name drug manufacturers lack the authority to alter a label's warnings "at the time the NDA process concludes," because "[t]hey have received approval only for that formulation and that label that survive the NDA process." *Id.* at *9; *accord Utts II*, 2017 WL 1906875, at *9; *see also In re Celexa*, 779 F.3d at 41 ("*Wyeth* effectively reserves the launch of new drugs to the expertise of the FDA"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 185 F. Supp. 3d 761, 769-70 (D.S.C. 2016) (because "FDA approved the Lipitor label" and "specifically approved [a particular] statement," federal law preempted "claim [that] Lipitor's label should have included different statements").

16

Moreover, any argument that preemption does not apply because BIPI could have asked the FDA for help in changing the Jardiance label before approval has been rejected by the Supreme Court. *See Mensing*, 564 U.S. at 620-21. The *Mensing* plaintiffs argued that, even though federal regulations required that generic labels conform to brand name labels and thus forbade generic manufacturers from changing generic labels, the generic manufacturers could have satisfied their state law duty to warn by asking for the FDA's help in changing the corresponding brand name label. The Court reasoned that, if the manufacturers had done so, "and if the FDA decided there was sufficient supporting information, and if the FDA undertook negotiations with the brand-name manufacturer, and if adequate label changes were decided on and implemented, then the [m]anufacturers would have started a Mouse Trap game that eventually led to a better label." *Id.* at 619. Such an argument, the Court held, "would render conflict pre-emption largely meaningless," since a private party can always, in principle, try to persuade "the Federal Government . . . [to] do something that makes it lawful for a private party to accomplish under federal law what state law requires of it." *Id.* at 620. The Supreme Court explained that "[s]tate law demanded a safer label; it did not instruct the [m]anufacturers to communicate with the FDA about the *possibility* of a safer label." *Id.* at 619 (emphasis added).[7]

---

[7] *Accord Houston v. United States*, 638 F. App'x 508, 514 (7th Cir. 2016) (hypothetical "receipt of [FDA approval] would be speculative anyway"); *see also Yates*, 808 F.3d at 299-300 (rejecting claim against branded drug manufacturer in design defect context as speculative,

The same type of speculation exists as to any inquiry about what the FDA might have done had BIPI submitted a different Jardiance label prior to FDA approval.

>    ii.   **Plaintiff's FAC Does Not Include Any Allegations To Support A Claim That BIPI Should Have Changed The Jardiance Label After FDA Approval.**

Plaintiff's FAC fails to articulate any newly acquired information, received by BIPI, that would have allowed BIPI to "utilize the CBE process," FAC ¶ 71(c), to change the Jardiance label after Jardiance was approved.  *See supra* at 6-8 (describing CBE requirements); *see generally Utts I*, 2016 WL 7429449, at *11 ("[F]ederal law expressly forbids a manufacturer from changing its label after the label has received FDA approval unless such changes are made pursuant to the CBE regulation.").  "[T]he plaintiff must show that there existed 'newly acquired information' such that the defendants could unilaterally change the label pursuant to the CBE regulation without FDA approval."  *Utts II*, 2017 WL 1906875, at *9. "Newly acquired information" is defined as "data, analyses, or other information *not previously submitted to the Agency*."  21 C.F.R. § 314.3 (emphasis added); *see also In re Celexa*, 779 F.3d at 42-43 (affirming dismissal of failure-to-warn claims on federal preemption grounds, where plaintiff failed to allege that information in

---

where plaintiff claimed that drug at issue should have been designed differently in first instance, *i.e.* prior to FDA approval); *Fleming v. Janssen Pharm., Inc.*, 186 F. Supp. 3d 826, 833 (W.D. Tenn. 2016) (finding allegations resting on defendants' "duty to design the drug differently before FDA approval" were "too attenuated and speculat[ive]") (internal quotation marks omitted).

question "was unknown to the FDA prior to label approval" and thus manufacturer could not use CBE process to alter label).  Thus, warnings claims are "preempted [where] the information upon which the [complaint] relies to plausibly plead these claims does not, upon examination, demonstrate that any *newly acquired* information exists to support a label change pursuant to CBE regulations."  *Utts II*, 2017 WL 1906875, at \*20 (dismissing claims) (emphasis added).

Here, Plaintiff pleads himself out of any CBE-related claim, because the FAC exclusively relies on alleged DKA-related data associated with other SGLT-2 inhibitor drugs that was available and submitted to the FDA "*before* JARDIANCE entered the market."  FAC ¶ 53.  By only making allegations regarding data available and submitted to the FDA *before* Jardiance's approval, Plaintiff "does not allege that [Defendant was] in possession of 'newly acquired information' such that [it] could, pursuant to the CBE regulation, act independently of the FDA to update" the Jardiance label with a DKA warning after the FDA approved Jardiance. *Utts I*, 2016 WL 7429449, at \*11 (dismissing strict liability and negligent failure-to-warn claims); *see also In re Celexa*, 779 F.3d at 42-43 (finding complaint could not "plausibly be read as relying on 'newly acquired information' in contending that [defendant] could have changed its label through the CBE procedures"); *Utts II*, 2017 WL 1906875, \*12-13, \*20 (finding documents and reports, including report that analyzed adverse drug event data uploaded to FAERS for drug class including

drug at issue, did not constitute "newly acquired information" and therefore dismissing failure-to-warn claims); *In re Lipitor*, 185 F. Supp. 3d at 769-71 (finding claims that defendants should have changed label through CBE process based on data already submitted to FDA preempted).[8]

Moreover, Plaintiff's allegation that "any of" the "more than 50 additional adverse events FDA collected after June 6, 2014 . . . could have allowed Defendant to utilize the CBE process and change the JARDIANCE label" does not plausibly plead any "newly acquired information" upon which BIPI could have based a label change pursuant to the CBE process. FAC ¶ 56. Plaintiff does not allege how many (if any) of these reports related to Jardiance and pre-dated his alleged injury, requiring dismissal of his implausibly pled claims. *See, e.g.*, *Fleming*, 186 F. Supp. 3d at 829, 836 (finding allegations that "FDA has since [approval] received a significant number of [DKA] reports" and that "despite the reported adverse events,

_____

[8] Plaintiff's allegation that "[u]pon information and belief, while the data was collected prior to Jardiance's approval, the FDA is perpetually understaffed and therefore could not and did not review this data prior to approving Jardiance's label," FAC ¶ 37; *see also id.* ¶ 45, is entirely speculative. *See Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level"). Beyond being speculative, the allegations border on being nonsensical. As a general matter, the FDCA requires the Secretary of Health and Human Services to "conduct regular screenings of the Adverse Event Reporting System database," and Plaintiff does not allege any facts in support of his allegations. 21 U.S.C. § 355(k)(5)(A). Moreover, as a specific matter, the fact that the FDA ultimately required a label change for the SGLT-2 inhibitor class based on its review of AER data belies the factually unsupported notion that the FDA was somehow ignoring such data. Finally, in all events, it is well settled in the 11th Circuit that "for purposes of a Rule 12(b)(6) motion to dismiss, [courts] do not have to take as true allegations based merely 'upon information and belief.'" *Smith v. City of Sumiton*, 578 F. App'x 933, 936 n.4 (11th Cir. 2014) (*per curiam*); *accord Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013).

[d]efendants have continued to fail to warn patients about [DKA]" amounted to only "conclusory statements as to the failure of [d]efendants to warn about the dangers of Invokana"); *House v. Bristol-Myers Squibb Co.*, No. 15-cv-894, 2017 WL 55876, at *4 (W.D. Ky. Jan. 4, 2017) (*per curiam*) (dismissing conclusory failure-to-warn allegations, including allegation that "FDA has since [approval] received a significant number of reports of [DKA]").

## II.   PLAINTIFF'S FAC REMAINS INSUFFICIENTLY PLED.

Without his new theory, which is preempted, all that remains of Plaintiff's FAC are allegations that appear to have been copied nearly verbatim from other complaints related to different SGLT-2 inhibitors, Invokana and Farxiga.  As another federal judge recognized in dismissing the Invokana complaint, however, the complaint consisted "largely of legal conclusions" and therefore failed to state a claim.  *Fleming*, 186 F. Supp. 3d at 835-36; s*ee House*, 2017 WL 55876, at *4 (dismissing complaint and explaining that, "[j]ust as in *Fleming*," plaintiff's "almost identical" strict liability failure-to-warn and negligence claims were insufficiently pled).  Plaintiff's FAC—his second attempt to plead facts sufficient to withstand a motion to dismiss—should meet a similar fate.

### a.  Plaintiff Has Not Stated A Claim Under The AEMLD (Count I).

The AEMLD, Alabama's judicially-created substitute for strict liability, modifies traditional strict liability by permitting affirmative defenses and

21

incorporating "nods to negligence theory." *Foster v. Bridgestone Americas, Inc.*,

No. 11-0175-WS-N, 2013 WL 489162, at *2-4 (S.D. Ala. Feb. 8, 2013); *accord*

*Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 132 (Ala. 1976).  To establish liability

under the AEMLD, a plaintiff must show

> (1) he suffered injury or damages to himself or his property by one who
> [sold] a product in a defective condition unreasonably dangerous to the
> plaintiff, as the ultimate user or consumer, if (a) the seller [was]
> engaged in the business of selling such a product, and (b) it [was]
> expected to and [did], reach the user or consumer without substantial
> change in the condition in which it [was] sold.

*Bodie v. Purdue Pharma Co.*, 236 F. App'x 511, 518 (11th Cir. 2007); *accord Miller*,

2014 WL 2155020, at *2.  For AEMLD claims involving prescription drugs like

Jardiance, "the adequacy of [the] accompanying warning determines whether the

drug, as marketed is defective, or unreasonably dangerous." *Bodie*, 236 F. App'x at

518 (quoting *Stone v. Smith, Kline & French Labs.*, 447 So. 2d 1301, 1304 (Ala.

1984)).  That is, "no AEMLD design defect claim for prescription drugs exists apart

from a challenge to the adequacy of the warning." *Barcal v. EMD Serono, Inc.*, No.

5:14-cv-01709-MHH, 2016 WL 1086028, at *3 (N.D. Ala. Mar. 21, 2016).

To prevail on a failure-to-warn claim, a plaintiff must prove that (1) the

manufacturer failed to provide his prescribing physician with adequate warnings

about risks of which it knew or should have known, and (2) the inadequate warning

proximately caused his injuries. *See, e.g.*, *Bodie*, 236 F. App'x at 518-19 (citing

*Walls v. Alpharma USPD, Inc.*, 887 So. 2d 881, 883 (Ala. 2004)); *see also Haney v.*

*Eaton Elec., Inc.*, 528 F. Supp. 2d 1262, 1269 (N.D. Ala. 2007).  The allegations in Plaintiff's FAC, like those in the *Fleming* and *House* complaints upon which the FAC is modeled, do not contain facts sufficient to support his failure-to-warn claims. Instead, the FAC's allegations, copied and pasted from *Fleming*, fail to plead how Jardiance's warnings rendered Jardiance defective and/or how Jardiance's defective warnings caused Plaintiff's alleged injuries.  *Compare* FAC ¶ 79 ("JARDIANCE contained warnings insufficient to alert consumers, including Plaintiff, to the dangerous risks and reactions associated with JARDIANCE, including the development of Plaintiff's [DKA].") *with Fleming*, 186 F. Supp. 3d at 836 (finding plaintiff's complaint, which included allegation that "INVOKANA contained warnings insufficient to alert consumers, including [p]laintiff, to the dangerous risks and reactions associated with INVOKANA, including the development of [p]laintiff's injuries," contained "only conclusory statements as to the failure of [d]efendants to warn about the dangers of Invokana"); *see also House*, 2017 WL 55876, at *4 (likewise dismissing failure-to-warn allegations involving Farxiga, because "[i]n *Fleming*, the court dismissed the plaintiff's almost identical failure-to-warn claims as insufficiently pled").[9]

---

[9] Even if Plaintiff's new failure-to-warn theory is not preempted (which it is), Plaintiff does not plausibly allege how Jardiance's label was defective or how the alleged defect in Jardiance's label caused Plaintiff's alleged injuries.  If Plaintiff is suggesting that the information contained in the FDA Alert should have been in Jardiance's label, Plaintiff does not plausibly allege that his unnamed prescribing physician would have read and heeded this alleged adequate warning

Plaintiff also fails to state a claim because Alabama has adopted the learned intermediary doctrine, which "imposes on a pharmaceutical company a duty to provide warnings *solely to the prescribing physician*, rather than to the patient directly." *Bodie*, 236 F. App'x at 516 (emphasis added); *accord Allain*, 2015 WL 178038, at *6. Thus, to prevail on a failure-to-warn claim, "a patient must make a specific showing: that the manufacturer failed to warn the physician of a risk not otherwise known to the physician and that the failure to warn was the actual and proximate cause of the patient's injury." *Elliott v. Sandoz, Inc.*, No. 2:16-cv-00861-RDP, 2016 WL 4398407, at *6-7 (N.D. Ala. Aug. 18, 2016). Here, the learned intermediary doctrine bars Plaintiff's claims for two different reasons.

First, Plaintiff's allegations that "Defendant had a continuing duty to warn *Plaintiff*," FAC ¶ 83 (emphasis added), and that "JARDIANCE contained warnings insufficient to alert consumers, *including Plaintiff*, to the dangerous risks and reactions associated with JARDIANCE," fail to the extent that Plaintiff bases his failure-to-warn claims on a failure to warn *him directly* of the alleged risk of DKA. *Id*. ¶ 79 (emphasis added); *see Batchelor v. Pfizer, Inc*., No. 2:12-CV-908-WKW, 2013 WL 3873242, at *2 (M.D. Ala. July 25, 2013) (dismissing claim based on failure to warn plaintiff directly). Similarly, Plaintiff's allegations that generically

---

and made a different prescribing decision. *See, e.g.*, *Barnhill v. Teva Pharm., USA, Inc.*, 819 F. Supp. 2d 1254, 1262 (S.D. Ala. 2011); *accord Allain*, 2015 WL 178038, at *6.

reference Defendant's failure to warn physicians and the medical community at large, *see e.g.*, *id.* ¶¶ 2, 24-25, 126-27, do not contain plausible facts that Defendant failed to warn *Plaintiff's prescribing physician* of the alleged risk of DKA and should therefore be dismissed.   *See, e.g.*, *Elliot*, 2016 WL 4398407, at *7 (disregarding "conclusory" allegation that "[d]efendant failed to provide adequate and required warnings to physicians" generally); *accord Allain*, 2015 WL 178038, at *6.  Second, Plaintiff merely alleges "general, conclusory statements concerning promotions, marketing, and education given to medical providers, but has not set forth any facts suggesting [his unnamed prescribing physician] was the target of or influenced by any of these actions."  *Elliot*, 2016 WL 4398407, at *7; *see also, e.g.*, FAC ¶ 25 ("Defendant conducted nationwide sales and marketing campaigns to promote JARDIANCE, and they willfully deceived Plaintiff, Plaintiff's health care professionals, the medical community, and the general public as to the health risks and consequences of the use of JARDIANCE.").

Finally, Plaintiff's AEMLD claim is deficient to the extent that it is premised on a failure to warn of unnamed "other related health complications."  FAC ¶¶ 94, 118.  Plaintiff only alleges that he developed DKA, *see id.* ¶¶ 4, 32, and does not identify what other alleged complications and inadequate warnings are at issue here, failing to provide "the grounds for his entitlement" to relief in this regard.  *Allain*, 2015 WL 178038, at *1.

### b.  Plaintiff Does Not State Plausible Claims For Negligence Or Gross Negligence (Counts II-III).

To prevail on a negligence claim, "Plaintiff must allege[] that the Defendant (1) breached (2) a duty, which (3) proximately caused (4) plaintiff's injury." *Miller*, 2014 WL 2155020, at \*4 (quoting *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 969 (Ala. 1985)).  "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty.  To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994).

### i.  Plaintiff's Negligence Count Is Factually Deficient And Must Be Dismissed (Count II).

Plaintiff's "catch-all" negligence claim—which is premised on Defendant's alleged failure "to exercise ordinary care in the research, development, marketing, supplying, promotion, marketing, advertisement, packaging, sale, testing, quality assurance, quality control, sale, and distribution of JARDIANCE" (*see* FAC ¶ 104)—fails for the same reasons his AEMLD claims fail.  *See supra* at 22-26.

With respect to any alleged manufacturing defect, *see* FAC ¶¶ 91, 105-08, 112, 130, 132, Plaintiff has not provided any "meaningful factual allegations" regarding such a claim. *Weldon v. Washington Nat'l Ins. Co.*, No. 2:13-cv-02209-RDP, 2014 WL 130486, at \*2 (N.D. Ala. Jan. 14, 2014) (dismissing negligence

claim).  Rather, Plaintiff appears to argue that, because Plaintiff allegedly suffered DKA after taking Jardiance, there must have been a manufacturing defect in the Jardiance he ingested.  These allegations are insufficient, because they simply recite the elements of a manufacturing defect claim without any supporting factual allegations.  *See, e.g.*, *House*, 2017 WL 55876, at *4 (dismissing negligent manufacturing claims involving Farxiga that consisted of "largely legal conclusions . . . insufficient to meet the *Twombly-Iqbal* standard").

Any negligence theory premised on Defendant's alleged failure to properly design Jardiance, *see, e.g.*, FAC ¶¶ 17-18, 23, 112, 128, 130, fails, because Alabama law does not recognize design defect claims for prescription drugs, regardless of whether the claims are brought under the AEMLD or a negligence theory.  Alabama has adopted comment k to § 402A of the Restatement (Second) of Torts, recognizing prescription drugs as within a category of products that are "unavoidably unsafe" or "quite incapable of being made safe for their intended and ordinary use."  *Stone*, 447 So. 2d at 1303 n1.  The Restatement is unambiguous: "in the case of an 'unavoidably unsafe' yet properly prepared prescription drug, the adequacy of the accompanying warning determines whether the drug, as marketed, is defective, or unreasonably dangerous."  *Id.* at 1304.  The Northern District of Alabama has explained that, "[b]ecause the rationale of the exception turns on the notion that prescription drugs are desirable even though they may never be made fully safe, [we] find[] the

exception equally applicable to design defect claims outside of the AEMLD," including negligent design claims, which also "hinge on the safety of the product." *Barcal*, 2016 WL 1086028, at *3 (dismissing design defect claims, including negligent design claims).

Furthermore, Plaintiff fails to plead any facts alleging how Jardiance's design was defective or how this alleged defect caused his injuries. Plaintiff alleges that SGLT-2 inhibitors "are designed to inhibit renal glucose reabsorption with the goal of lowering blood glucose" and, as a result, "excess glucose is not metabolized, but instead is excreted through the kidneys of a population of consumers already at risk for kidney disease." FAC ¶ 17. Simply repeating the mechanism of action does not support a design defect claim; at least two federal courts confronted with this exact allegation could not "reasonably infer from the generic description of SGLT-2 inhibitors' mechanism of action that [the SGLT-2 inhibitor at issue] was defective or unreasonably dangerous" and dismissed the complaints. *House*, 2017 WL 55876, at *3-5 (quoting *Fleming*, 186 F. Supp. 3d at 835). Plaintiff does not allege how this or any other aspect of Jardiance's design supposedly increases the risk of DKA, and therefore fails to allege sufficient facts to support a *reasonable* inference that a defect in Jardiance's design caused his alleged injury. *See, e.g., Hughes v. Stryker Corp.*, 423 F. App'x 878, 880 (11th Cir. Apr. 14, 2011) (*per curiam*) (holding that fact of

injury does not establish defect because plaintiff must show that product defect caused alleged injury).[10]

Finally, any negligent design claim brought by Plaintiff fails for the additional reason that it is preempted by federal law. This preemption analysis applies equally to all design defect claims, whether brought pursuant to the AEMLD or under a negligence theory. *See, e.g.*, *Barcal*, 2016 WL 1086028, at *4 (dismissing design defect and negligent design claims because such claims "would essentially require [defendant] to redesign [the medication at issue]" without FDA approval and reasoning "[t]his is precisely the kind of impossibility in which the Supreme Court has found preemption"); *see also Yates*, 808 F.3d at 298-300 (design defect claims against all pharmaceutical manufacturers are "clearly preempted by federal law"); *Fleming*, 186 F. Supp. 3d at 832-33 (dismissing strict liability design defect and negligent design claims as preempted by federal law).

### ii. Plaintiff Does Not State A Claim For Willful And Wanton Conduct Or Gross Negligence (Count III).

---

[10] Additionally, while Plaintiff alleges that "Consumers . . . have several alternative safer products available to treat the conditions, including metformin, Diabinese, Amaryl, or Glucotrol," FAC ¶ 23," he does not identify this alleged safer alternative *design*, nor does he explain how it would have prevented his alleged injury, further causing any negligent design claim to fail. *See, e.g.*, *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1056 (11th Cir. 1994) ("[A] plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured its product.").

Plaintiff's gross negligence count merely restates his implausible AEMLD claims, *see* FAC ¶ 129 ("Defendant failed to provide adequate warnings"), and should therefore be dismissed for the same reasons. *See House*, 2017 WL 55876, at *4, (dismissing gross negligence claims premised on "same insufficient allegations" underpinning failure-to-warn claims). Likewise, Plaintiff's claims premised on Defendant's "complete indifference to or a conscious disregard for to [sic] the rights, safety, or welfare of others," FAC ¶ 122, "contain no allegations other than legal conclusions," and should be dismissed. *Stanley ex rel. L.B. v. Bullock Cty. BOE*, No. 2:07-cv-681-WHA, 2007 WL 4105149, at *5 (M.D. Ala. Nov. 15, 2007) (dismissing gross negligence claim, where plaintiff alleged "in conclusory fashion" that defendants' conduct "was so egregious as to rise to gross negligence inferring malice" but provided no supporting factual allegations).

## CONCLUSION

For the reasons outlined above, Plaintiff's FAC fails to satisfy the requirements of Fed. R. Civ. P. 8(a) and 12(b)(6) and should be dismissed.

Dated: June 19, 2017

Respectfully Submitted,

/s/ F.M. Haston, III
F. M. Haston III (ASB-885-a64f)

30

**OF COUNSEL**

F. M. Haston, III
Ellen S. Presley (ASB-0135-e49p)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Tel. (205) 521-8000
Fax (205) 488-6000
Email:  thaston@bradley.com
Email:  epresley@bradley.com

Heidi Levine, *pro hac vice*
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, NY 10019
Tel. (212) 839-5300
Fax (212) 839-5599
hlevine@sidley.com

Elizabeth C. Curtin, *pro hac vice*
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, Illinois 60603
Tel. (312) 853-0524
Fax (312) 853-7036
ecurtin@sidley.com

***Counsel for Defendant Boehringer
Ingelheim Pharmaceuticals, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2017 a copy of the foregoing was filed using the Court's CM/ECF system, which will send electronic notification to the following:

Richard A. Wright
B. Kristian W. Rasmussen
CORY WATSON, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205
Email:  rwright@corywatson.com
Email:  krasmussen@cwcd.com
***Counsel for Plaintiff***

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant:

Timothy J. Becker, Esquire
Rolf T. Fiebiger, Esquire
JOHNSON BECKER, PLLC
33 South Sixth Street, Suite 4530
Minneapolis, Minnesota 55402
Email:  tbecker@johnsonbecker.com
Email:  rfiebiger@johnsonbecker.com
***Counsel for Plaintiff***

/s/ F. M. Haston III

OF COUNSEL